UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| SANTOS GOMEZ, III,<br><br>Plaintiff,<br><br>v.<br><br>KARON GONZALES, *et al.*,<br><br>Defendants. | No. 5:23-CV-00148-H |

**OPINION AND ORDER**

Plaintiff Santos Gomez, III, is a self-represented, civilly committed sexually violent predator (SVP) confined in the Texas Civil Commitment Center (TCCC) for long-term supervision and treatment. The TCCC is operated by the Management & Training Corporation (MTC) under the supervision of the Texas Civil Commitment Office (TCCO). Plaintiff sues his TCCO case manager, Karon Gonzalez, and three MTC supervisors, Wayne Schmoker, James Winckler, and Stetson Fisher, for retaliation, violation of his due process rights, deliberate indifference to his health and safety, and violations of his rights under the Americans with Disabilities Act (ADA). Plaintiff's remaining claims focus on two distinct events—his demotion from Tier 4 to Tier 2 following a behavioral issue and the denial of a bottom-bunk assignment. He asserts that these events are connected—that the tier demotion violated his due process rights, and because he successfully challenged his tier demotion in state court, the defendants retaliated against him by reassigning him to a top bunk despite his documented knee pain.

Defendants now move for summary judgment. Dkt. Nos. 71, 74. Defendants assert that they are entitled to summary judgment because the competent summary judgment

evidence, Dkt. Nos. 73, 75, shows no violation of Plaintiff's constitutional or federal rights. *See* Dkt. Nos. 72, 74. Plaintiff responded to the defendants' motions, insisting that his claims have merit and should proceed to trial.[1] Dkt. Nos. 78, 81. Defendants Schmoker, Winckler, and Fisher replied.[2]

As explained below, the Court finds that Plaintiff did not have a constitutionally protected liberty interest in his tier placement, and he received all the process he was due through the state-court proceedings. Moreover, in light of the summary judgment evidence, Plaintiff cannot show that his reassignment to a top bunk would not have happened if not for his state-court challenge to his tier demotion. And in any event, Plaintiff cannot demonstrate that his temporary top-bunk assignment violated his constitutional or federal rights. In other words, after reviewing the pleadings, the competent summary judgment evidence, and the applicable law, the Court finds that no genuinely disputed issue of material fact remains to require trial on Plaintiff's claims. As a result, Defendants' motions for summary judgment are granted.

## 1. Plaintiff's Allegations

Plaintiff asserts that (1) Defendant Gonzales violated his due process rights by demoting him from Tier 4 to Tier 2, (2) Defendants Schmoker, Fisher, and Gonzales retaliated against him by moving him to a top bunk, (3) Defendant Winckler violated his Fourteenth Amendment right to health and safety by denying him a bottom bunk for four

---

[1] Plaintiff also improperly attempts to raise new claims and to revive claims that were previously dismissed from this case. *See* Dkt. Nos. 78, 81.

[2] Defendant Gonzales sought a brief extension of time to file her reply. Dkt. No. 83. But the extended deadline she requested has long since passed, and she did not file a reply or seek a second extension to do so. As a result, the Court denies the motion for extension as moot.

months (from June 7–October 3, 2022), and (4) all of the defendants violated his rights under the ADA by failing to reasonably accommodate his disability with respect to his assignments.

He seeks monetary, declaratory, and injunctive relief.

## 2. Defendants' Motions

### A. Grounds

First, Defendant Gonzales argues that Plaintiff did not have a constitutionally protected liberty interest in his tier status, and he received all the process he was due under state law. She also contends that, as Plaintiff's case manager, she was not involved in the state-court proceedings, was unaware of the first state-court order, and lacked the authority to restore Plaintiff's tier status until she was directed to do so by the Deputy Director of TCCO. Finally, she asserts that she had no control or influence over Plaintiff's bunk assignments, because MTC was responsible for Plaintiff's housing. Thus, she argues that the records cannot support Plaintiff's retaliation claim against her, or his ADA claim against TCCO. Dkt. No. 74.

The MTC defendants argue that the evidence shows that he was given appropriate medical attention, treatment, and reasonable accommodations for his knee pain. Specifically, Defendants contend that Defendant Winckler did not ignore any serious risk to Plaintiff's health or safety but prioritized bottom bunk assignments within the space limitations of the TCCC by routinely consulting with the medical department and monitoring the wait list. They point to the records and assert that, in any event, Plaintiff was not harmed by the four-month delay in receiving a bottom bunk. Next, the MTC defendants argue that the records cannot support Plaintiff's retaliation claim against

Schmoker or Fisher. They contend that there is no evidence of any connection between Plaintiff's state-court challenge to his tier demotion and his bunk reassignment, nor is there any evidence that Schmoker or Fisher took any part in deciding to reassign Plaintiff to a top bunk or in communicating that decision to Plaintiff. Finally, the MTC defendants argue that Plaintiff's ADA claim should be dismissed because he was offered, but refused, a reasonable accommodation in the form of a bottom bunk assignment in a higher security area, and because his preferred accommodation was not reasonable under the circumstances because of the facility's limitations.

**B. Evidence**

In support of her motion, Defendant Gonzales offers the following summary judgment evidence:

A. The business records affidavit of TCCO's custodian of records;

B. The chronological reports of Plaintiff's treatment and supervision;

C. The affidavit of TCCO Deputy Director Jessica Marsh;

D. The State of Texas's motion to vacate or set aside the state court's order nullifying Plaintiff's tier demotion;

E. Deputy Director Marsh's email to Defendant Gonzales directing her to implement the ordered tier change;

F. TCCO's Organization Chart; and

G. Plaintiff's Supervision Progress Reports.

Dkt. No. 75.

And in support of their motion, the MTC Defendants submitted the following summary judgment evidence:

A. The declaration of MTC Health Services Administrator Stephanie Hernandez;

B. The declaration of Wayne Schmoker;

C. The declaration of Stetson Fisher;

D. A certification of business records;

E. Excerpts from Plaintiff's medical chart;

F. The November 4, 2021 incident report;

G. Plaintiff's bed assignment history;

H. A June 30, 2022 email re bottom bunk availability;

I. Plaintiff's August 2022 communication form;

J. Excerpts from Plaintiff's sex-offender treatment records; and

K. The declaration of James Winckler.

Dkt. No. 73.

The summary judgment evidence establishes the following undisputed facts:

**i. Background**

TCCO is tasked with providing appropriate and necessary treatment and supervision for civilly committed SVPs like Plaintiff.[3] Treatment is delivered in five progressive tiers. Tiers One through Four are located at the TCCC. Tier Five is delivered while the SVP is residing in a home plan in the community. Progression through the tiers is self-paced, and, as the SVP progresses through the tiers, he or she can earn more privileges and may be moved to less restrictive housing within the TCCC. Movement between programming tiers is recommended by the SVP's treatment team, which includes their case manager and their sex offender treatment provider. Dkt. No. 75 at 448. Additional guidance may be sought from the Clinical Director or Director of Case Management Services as needed. *Id.*

---

[3] See https://tcco.texas.gov/sites/default/files/documents/civil-commitment-program-overview.pdf, an official State of Texas website; *see also* Tex. Health & Safety Code §§ 841.081–841.085.

### ii. Plaintiff's Disciplinary Charge and Tier Demotion

Plaintiff was civilly committed in 2016. By July 2021, Plaintiff had progressed to Tier Four and completed almost all of the requirements for advancement. Dkt. No. 1 at 80–84; Dkt. No. 75 at 34–35. Defendant Gonzales recommended that Plaintiff promote to placement in an Advanced Group Environment (AGE) dorm, which allows Tier Four residents to prepare for their return to the community by living in studio-style apartments within the TCCC.[4] *Id.* There is no "clinically significant difference between AGE and Tier 5." Dkt. No. 75 at 81. On September 24, 2021, Plaintiff's treatment team "discussed AGE placement/Tier 5 promotion; however, the treatment team" did not agree to move forward with the recommendation at that time. *Id.* at 84.

Then on November 4, 2021, Defendant Gonzales discovered that Plaintiff had recently attempted to contact his daughter, who is a victim of his underlying sexual offense, by sending a text message meant for her to his mother and sister, in violation of the TCCC rules and his order of civil commitment. *Id.* at 99–100. Plaintiff was placed in the Special Management Unit (SMU) pending disciplinary action, and Defendant Gonzales notified law enforcement of the potential violation of Plaintiff's commitment requirements. Ultimately, no criminal charges were filed, because Plaintiff's attempted contact did not succeed. *Id.* at 448.

Plaintiff's treatment team met and decided to demote Plaintiff from Tier 4 to Tier 2 with Tier 1 privileges but permitted him to remain with his Tier 4 group for therapy. *Id.* at 100. Plaintiff received written notice of the demotion decision. *See* Dkt. No. 1 at 121.

---

[4] *See* https://tcco.texas.gov/sites/default/files/documents/tcco-biennial-report-2024.pdf

Separately, Plaintiff was brought before the Behavioral Management Committee for a disciplinary hearing. He admitted to sending the text message, was found guilty of the disciplinary infraction, and was assessed temporary privilege restrictions. *Id.* at 122, 168.

**iii. State-Court Proceedings**

Plaintiff filed a petition in state court challenging his tier demotion. *See* Dkt. No. 75 at 451. The state court scheduled a hearing in May 2022, but the parties jointly asked the court to reset the hearing for the following month. *Id.* Instead of rescheduling the hearing, the state court entered an order nullifying the TCCO's decision to demote Gomez's treatment tier. *Id.*; Dkt. No. 1 at 186. The court reasoned that the demotion was not warranted because the "incident and follow-up actions were not in compliance with Texas Health and Safety Code, Chapter 841.0834(d) as a hearing was not held within 90 days." Dkt. No. 1 at 186. So the court ordered TCCO to restore Plaintiff's Tier 4 status. *Id.*

The State of Texas moved to vacate or set aside the state court's order, arguing that the order was invalid because the court was statutorily required to hold a hearing, and that the court's order otherwise misapplied the state law. Dkt. No. 75 at 450–461. The state court reset the case for a hearing, which was held in September 2022. Plaintiff remained in Tier 2 while the state-court proceedings continued. *Id.* at 449. After the hearing, the court again granted Plaintiff relief and entered an order reversing Plaintiff's tier demotion on October 3, 2022. Dkt. No. 1 at 119. The same day, TCCO Deputy Director Marsh emailed Defendant Gonzales and instructed her to implement the necessary changes to restore Plaintiff's Tier 4 status. Dkt. No. 75. at 473.

### iv. Plaintiff's knee issues and bunk assignments

Meanwhile, in September 2021, Plaintiff visited the medical department twice complaining of pain in his left knee. *See* Dkt. No. 73 at 39–42. After the first visit, he was given a Medrol dose pack and ibuprofen. *Id.* at 41. After examining him during his second visit, Dr. Eric Guy noted no abnormality or swelling and recommended conservative management and over-the-counter Tylenol or Motrin. After another sick call request a few weeks later, Plaintiff refused to see Dr. Guy again because he "[r]efused to evaluate or prescribe pain meds for [Plaintiff's] knee." *Id.* at 80.

In November 2021, Plaintiff slipped in the shower, which caused minor swelling in his left knee. *Id.* at 82. Medical providers ordered an x-ray, approved a knee sleeve and physical therapy, and issued a bottom-bunk pass for 60 days. *Id.* at 32–36. After he finished physical therapy, he complained that he still had pain and requested another bottom-bunk pass because his first had expired. *Id.* at 69. He was given another bottom-bunk pass for 60 more days—from March 16, 2022–May 15, 2022. *Id.* at 31, 69. He had a telehealth visit for knee pain on May 3, 2022, and his provider ordered an MRI. *Id.* at 27–29. Plaintiff requested a renewal of his bottom-bunk pass on May 19, 2022, and after evaluation, Dr. Guy noted that an MRI was scheduled and that Plaintiff should have a bottom bunk until the knee issue was resolved. *Id.* at 25. But no bottom-bunk pass was entered in the computer system or otherwise communicated to the security team that day. *Id.* at 3.

Plaintiff had another medical appointment on June 2, 2022. *Id.* at 22. His provider recommended over-the-counter pain medication, a muscle rub, and better footwear. *Id.* There is no evidence that a bottom-bunk pass was discussed or entered on that day. *Id.* His MRI was scheduled for June 15, 2022. *Id.* at 20.

On June 7, 2022, after his bottom-bunk pass expired, Plaintiff was reassigned to a top bunk. Dkt. No. 73 at 85; *see also* Dkt. No. 75 at 191. Two days later, Plaintiff fell trying to climb into his top bunk. Dkt. No. 73 at 86. When security and medical personnel responded, he was sitting on the floor and did not have any obvious visible injuries. *Id.* He got up and walked to the medical department "without any problems." *Id.* He was seen separately by two medical providers that day. The records show that he demonstrated full range of motion in both his upper and lower extremities, his gait was steady, he had no swelling, and mild pain. *Id.* at 17, 18. He was noted to "sit and stand with ease out of [a] chair." *Id.* at 18. He reported to Nurse Urbina that he was able to climb onto the top bunk, but he needs something more stable to climb. *Id.* He asked whether he could be moved to a bottom bunk in the medical department or the SMU, but then he declined those options when he learned that he would lose certain privileges because of the policies in those areas. *Id.* He walked back to his housing unit. *Id.* at 19.

Plaintiff's MRI results came in on June 17, 2022, indicating a baker's cyst and a possible bucket handle meniscus tear. Dkt. No. 73 at 16. He received a referral for an orthopedic consult, orders for physical therapy, and a new bottom-bunk order. *Id.* The medical records note, however, that when the provider attempted to enter the bottom-bunk pass into the computer system, it would not save her changes. *Id.* at 15. So she notified Defendant Winckler and another MTC official about the bottom-bunk pass. *Id.* Plaintiff was put on a waitlist because no bottom bunks were available. *See id.* at 23, 89, 95–96. The priority of residents on the wait list was re-evaluated as beds became available. *Id.* at 96. While Plaintiff was on the wait list for a bottom bunk, staff—including Defendant

Winckler—observed Plaintiff working out, noting that he "appeared to be in shape[,] not in any distress[,] and he did not seem to have any trouble with his movements." *Id.*

Plaintiff completed physical therapy, *id.* at 55–88, and turned in his knee brace, *id.* at 14. He returned to medical on July 27 and August 30, 2022, asking for pain medication and inquiring about a bottom bunk. Dr. Guy noted that he rejected his knee brace and informed him that a bottom bunk pass was "not indicated" despite his torn meniscus. *Id.* at 13, 14. Around the same time, Plaintiff sent a communication form to Defendant Winckler requesting to be moved to a bottom bunk based on his injury, and Winckler responded that he would review it. *Id.* at 90. Plaintiff returned to medical on September 8, 2022, and the provider noted that Plaintiff's physical therapy had helped his condition, and he no longer needed to see ortho. *Id.* at 11. Even so, the provider recommended a bottom bunk for 30 days. *Id.* Plaintiff was re-assigned to a bottom bunk on October 3, 2022.

## 3. Legal Standards

### A. Summary Judgment

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, courts must not make credibility determinations or weigh evidence but must instead draw all reasonable inferences in favor of the non-moving party. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008); *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 409 (5th Cir. 2002).

"Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v.*

*Tennessee Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir. 1998) (quoting *Skotak v. Tenneco Resins,* 953 F.2d 909, 915 n.7 (5th Cir. 1992)). To the extent, however, that a prisoner-plaintiff's allegations are verified under penalty of perjury, they "are deemed competent summary judgment evidence." *Al-Raid v. Ingle,* 69 F.3d 28, 32 (5th Cir. 1995). That said, summary judgment "may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015).

**B. Fourteenth Amendment**

Involuntarily committed persons are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321–22 (1982). Because Plaintiff "has been civilly committed to state custody as a [sexually violent predator]," however, "his liberty interests are considerably less than those held by members of free society." *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006) (citing citing *Wilkinson v. Austin*, 545 U.S. 209, 224–26 (2005) and *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

So, civilly committed SVPs, like pretrial detainees, are entitled to be free from conditions that amount to punishment. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Even so, "the Constitution . . . affords a state wide latitude in crafting a civil commitment scheme." *Brown v. Taylor*, 911 F.3d 235, 243 (5th Cir. 2018). And courts recognize that the supervision and treatment of sexually violent predators often requires state officials to make "difficult policy choices." *Id.*

Not every restriction imposed during civil commitment "amounts to punishment in the constitutional sense." *Bell*, 441 U.S. at 537. Even restrictions that are discomforting or

that the committed person would not experience in the free world may be permissible. *Id.* at 540. "Due process requires only that 'the conditions and duration of confinement . . . bear some reasonable relation to the purpose for which persons are committed." *Brown,* 911 F.3d at 243 (quoting *Seling v. Young*, 531 U.S. 250, 265 (2001)). Relevant here, Texas's civil commitment scheme is premised on the "twin goals 'of long-term supervision and treatment of sexually violent predators." *Id.* (citing Tex. Health & Safety Code § 841.001; *In re Commitment of Fisher*, 164 F.W.3d 637, 651 (Tex. 2005)).

**4. Analysis**

After reviewing the parties' pleadings, the competent summary judgment evidence, and the applicable law, the Court finds that no genuine issues of material fact remain, and Defendants are entitled to summary judgment.

**A. Plaintiff received all the process he was due.**

Plaintiff contends that he had a protected interest in his Tier 4 status, so before he could be demoted, he was owed the process described in *Wolff v. McDonnell*, 418 U.S. 539 (1974), including written notice; a hearing by an independent clinical decision maker with an opportunity to be heard, present evidence, and confront accusers; a written statement by the fact finder explaining its reasoning; the availability of qualified assistance such as an attorney; and notice of all of these rights. Dkt. No. 1 at 35.

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who would seek to invoke its procedural protections must establish that one of these interests is at stake." *Richards*, 2023 WL 6533453, at *7 (quoting *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005)). Courts use a two-step inquiry when considering procedural due process claims. "The first question asks whether there exists a liberty or property interest which has been interfered with by the

State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Id.* (quoting *Meza v. Livingston*, 607 F.3d 392, 399 (5th Cir. 2010)).

"The degree of protection afforded to a liberty interest under the Fourteenth Amendment depends on the degree of freedom granted to the civil committee[.]" *Hitt v. McLane*, 2019 WL 13080577, at *7 (W.D. Tex. Apr. 26, 2019). It is well settled that the Due Process Clause does not protect every change in the conditions of confinement having a substantially adverse impact on a detainee. *Meachum v. Fano,* 427 U.S. 215, 224 (1976). For example, "the Due Process Clause does not protect an individual's interest in remaining at a particular form of institutional confinement, whether it be a prison or a halfway house." *Haley v. Kintock Grp.*, 587 F. App'x 1, 3 (3d Cir. 2014), *as amended* (Oct. 7, 2014). But an individual who has been conditionally released from institutional confinement into the community, such as a parolee, may have a liberty interest in his continued freedom that warrants some procedural protections. *Young v. Harper*, 520 U.S. 143, 148 (1997); *see also Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) (explaining that "due process is flexible and calls for such procedural protections as the particular situation demands").

"Whether 'due process' has been accorded a plaintiff is not material unless he demonstrates that state action deprived him of a constitutionally protected interest." *Neuwirth v. Louisiana State Bd. of Dentistry*, 845 F.2d 553, 557 (5th Cir. 1988). The "constitutional purpose" of due process "is to protect a substantive interest to which the individual has a legitimate claim of entitlement." *McFaul v. Valenzuela,* 684 F.3d 564, 579 (5th Cir. 2012). To the extent a plaintiff alleges a freestanding due process claim, "process is not an end in itself." *Id.* at 579 (brackets and citation omitted).

The parties agree to the basic facts surrounding Plaintiff's demotion process. It is undisputed that SVPs in Tiers 1–4 reside on the secure TCCC campus. Movement through the tiers is self-paced, and there is no set timeline for advancement. In October 2021, before the text-message incident, Plaintiff was assigned Tier 4 and remained in total confinement on the TCCC campus. Although Defendant Gonzales had recommended his advancement to AGE/Tier 5 status, his treatment team had not moved forward with that recommendation.

Undoubtedly, Plaintiff's text message—written to a victim of his underlying sex offenses—demonstrated a setback in Plaintiff's treatment progress. So, on November 4, 2021, his treatment team, including Defendant Gonzales, met to discuss the incident and adjust Plaintiff's treatment plan. The team determined that the behavior warranted a demotion from Tier 4 to Tier 2. Dkt. No. 75 at 100. However, the team decided that it would be best for Plaintiff to remain in therapy with his Tier 4 group because "this level of group participants could hold him accountable in a manner tha[t] perhaps Tier 2 could not." *Id.* at 215.

Plaintiff received written notice of the tier change the next day, on November 5, 2021, which was ten days before the change was scheduled to take effect. Dkt. No. 1 at 121. And he had the opportunity to challenge his tier demotion in state court, which he used.

Because Plaintiff had not advanced to Tier 5 status, he did not have a constitutionally protected interest in his programming tier. But Plaintiff did not have a constitutionally protected interest in his movement between programming tiers within the institutional confinement setting of the TCCC. Thus, he is not entitled to the full range of procedural protections set forth in *Wolff.* State law does provide some procedural

protections, however, and Plaintiff benefitted from that process. The state legislature "gave the TCCO authority to place committed persons in more or less restrictive settings based on the need to protect the community and the person's needs for treatment and supervision." *Richards v. McLane*, No. 21-20450, 2023 WL 6533453, at *1 (5th Cir. Oct. 6, 2023) (citing Tex. Health & Safety Code § 841.0834). Texas state law also provides a mechanism for a civilly committed SVP to challenge his tier placement in the state court that adjudicated his commitment. *See* § 841.0834(b) (providing that "[w]ithout the office's approval, a committed person may file a petition with the court for transfer to less restrictive housing and supervision"); *see also Rogers v. McLane*, No. 5:22-CV-130-BQ, 2023 WL 4629044, at *16 (N.D. Tex. June 30, 2023), *report and recommendation adopted,* No. 5:22-CV-130-C-BQ, 2023 WL 4636894 (N.D. Tex. July 19, 2023).

The undisputed summary judgment evidence establishes that Plaintiff was afforded all the process he was due under state law. He disagreed with the treatment team's decision, but he was given written notice of the change and had the opportunity to challenge his tier placement in state court. And the process worked to his benefit. After a hearing,[5] the state court reversed his tier demotion and ordered TCCO to restore his Tier 4 status. And it is

[5] Plaintiff complains that TCCO did not immediately implement the state court's first, premature order nullifying his tier demotion. But that order stemmed from a defect in the statutory process. The records show that the state court failed to have a hearing before its first order, as required by the statute. *See* Dkt. No. 75 at 450–461. Although the hearing requirement protected both parties, significantly, Plaintiff reserved his right to a hearing before the state court's premature order. *Id.* at 452. The records show that the State of Texas moved to vacate the state court's first order to enforce the statutorily required hearing process, and the state court responded by reopening the matter and rescheduling it for a hearing, implicitly vacating its first order. In other words, the state court's first order was entered in violation of the process to which Plaintiff was entitled, and the state court course-corrected by having a hearing and entering its second order. And importantly, once the required process was complete, TCCO acted to restore Plaintiff's Tier 4 status as ordered.

undisputed that, once TCCO received the state court's final decision, Defendant Gonzales was instructed to, and did, remove Plaintiff's GPS monitor and restore his Tier 4 status.[6]

In short, the Court concludes that Plaintiff did not have a constitutionally protected liberty interest in his Tier 4 status. In any event, the summary judgment evidence shows that Plaintiff was given all the process he was due under state law—including notice, an opportunity to challenge the demotion in state court, a hearing, and a written decision. And through that process, Plaintiff received equitable relief—an order restoring his Tier 4 status. Thus, Plaintiff's request for injunctive or declaratory relief is moot. In other words, Plaintiff effectively used the process available to him. And he alleges no facts to show that the process afforded was constitutionally deficient. Nor has he pointed to any disputed facts that suggest Defendant Gonzales individually violated his due process rights.

Thus, the Court finds that Defendant Gonzales is entitled to summary judgment on Plaintiff's due process claim.

**B. The records belie Plaintiff's retaliation claims.**

Next, Plaintiff contends that after he challenged his tier demotion in state court, Defendants Gonzales, Schmoker, and Fisher retaliated against him by reassigning him to a top bunk. To support that contention, he relies primarily on the timing of his bunk reassignment. He alleges that he personally presented the state court's first order to Defendants Gonzales and Schmoker on June 6, 2022, and asked them if and when they were going to comply with it. And the next day, June 7, 2022, Defendant Schmoker

---

[6]Plaintiff does not refute that TCCO implemented the state court's order and restored his Tier 4 status on October 3, 2022. But he does complain that TCCO failed to put him back on the list for advancement to AGE placement. *See* Dkt. No. 1 at 32. But Plaintiff fails to show that he had any vested interest in his consideration for additional privileges. Thus, he has not disputed any fact material to the Court's due process analysis.

reassigned him to a top bunk. He asserts that although Schmoker made the decision, a different officer, Sergeant Michael Arnivas, communicated the change to him and forced him to move to a top bunk. He also alleges that, the same day, Defendant Fisher lied to him and told him his bottom bunk pass had expired.

A valid retaliation claim requires a plaintiff to allege that: (1) he exercised a specific constitutional right; (2) the defendant intended to retaliate against him because he exercised that right; (3) he experienced a retaliatory adverse act; and (4) the adverse act would not have occurred but for a retaliatory motive. *Welsh v. Cammack*, No. 23-10961, 2024 WL 3649583, at *4 (5th Cir. Aug. 5, 2024) (citing *Jones v. Greninger*, 188 F.3d 322, 324–25 (5th Cir. 1999)). An actionable retaliatory adverse act is one capable of deterring a person of ordinary firmness from further exercising his constitutional rights. *Id.* (citations omitted). A plaintiff must offer direct evidence of motivation or allege a chronology of events from which retaliation may plausibly be inferred. *Id.*

The summary judgment evidence adds considerable context to Plaintiff's assertions. First, the records show that space was limited at the TCCC, and there was a wait list for residents with medically issued bottom-bunk passes. MTC took measures to create more lower beds, but they were limited by available floor space and safety requirements. Defendant Winckler relied on medical staff to prioritize those on the wait list, and he regularly adjusted bunk assignments to move those without passes (or with expired passes) to top bunks and accommodate residents with new bottom-bunk passes. And the records reveal that Plaintiff's bottom-bunk pass expired on May 3, 2022. The records also show that, although Dr. Guy may have intended to renew Plaintiff's bottom-bunk pass on May 20, 2022, no pass was entered into the computer system.

Next, the summary judgment evidence reflects that Defendant Winckler was responsible for all bunk assignments at the TCCC. Defendant Schmoker did not monitor or participate in bunk assignments. Defendant Fisher sometimes helped move residents between housing or bunk assignments at Defendant Winckler's direction, but he did not choose or influence any bunk assignments. Finally, as a TCCO case manager, Defendant Gonzales had no involvement in Plaintiff's bunk assignments.

Defendants Schmoker and Fisher dispute Plaintiff's assertion that he presented them with the state court's order on June 6, 2022. Defendant Fisher does not recall ever being presented with the order, and he asserts that even if he were, he lacked the authority to change Plaintiff's bunk assignment. Defendant Schmoker asserts that he was notified of the state court's order around June 16, 2022—after Plaintiff had already been reassigned to a top bunk—and he does not recall taking any specific action on it. But because he was not responsible for housing assignments, at most, he would have followed up with Defendant Winckler.

Viewing the disputed facts in the light most favorable to Plaintiff, the Court assumes at this stage that Plaintiff presented the state court's order to Defendants Gonzales and Schmoker on June 6. But even so, the records disconnect that interaction from the retaliatory adverse act he complains of—his bunk reassignment. The undisputed records show that even if they knew about the state court's order, neither Defendant Gonzales nor Defendant Schmoker took part in the bunk reassignment decision. Moreover, even if Defendant Fisher participated in communicating the reassignment to Plaintiff, the records show that the assignment was made for independent, non-retaliatory reasons. Bottom bunks were limited, and the computer system did not reflect a bottom-bunk pass for Plaintiff

on June 7, 2022.[7] Plaintiff provides no direct evidence of retaliation. And in this context, Plaintiff's allegations fail to establish a chronology of events from which retaliation can be reasonably inferred. Thus, Defendants Gonzales, Schmoker, and Fisher are entitled to summary judgment on Plaintiff's retaliation claims.

### C. Defendant Winckler was not aware of, and did not intentionally disregard, any substantial threat to Plaintiff's health or safety.

Next, Plaintiff asserts that after he was reassigned to a top bunk, Defendant Winckler was deliberately indifferent to his health and safety by refusing to move him back to a bottom bunk for four months. As a civilly committed SVP, Plaintiff's "claim of deliberate indifference is derived from the Due Process Clause of the Fourteenth Amendment," but "the protection afforded him is functionally indistinguishable from the Eighth Amendment's protection for convicted prisoners."[8] *Smego v. Mitchell*, 723 F.3d 752, 756 (7th Cir. 2013); *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996). Thus, courts apply the same deliberate-indifference standard to pretrial and civil detainees as well as convicted prisoners.

---

[7]Plaintiff asserts both that his earlier bunk pass did not expire, and that Dr. Guy entered a new bunk pass on May 20, 2022. The records show that Plaintiff had reason to believe that Dr. Guy issued a bottom-bunk pass on that day. But Plaintiff does not rebut the summary judgment evidence that no pass was actually entered into the computer system or otherwise communicated to MTC staff that day. As a result, Plaintiff fails to show that any of the defendants were aware of Dr. Guy's recommendation, further attenuating his retaliation claims.

[8] As the Court has acknowledged, Dkt. No. 37. the Fifth Circuit has not yet decided the appropriate standard to apply to medical care claims from civilly committed plaintiffs. *Welsh v. Cammack*, No. 23-10961, 2024 WL 3649583, at *4 (5th Cir. Aug. 5, 2024) (citing *Youngberg v. Romero*, 457 U.S. 307 (1982) and *Miguel v. McLane*, No. 22-10517, 2024 WL 747232 (5th Cir. Feb. 23, 2024) (per curiam)). But here, the parties all apply the deliberate-indifference standard in their briefing, and the Court analyzes Plaintiff's claims primarily under that standard too. But even if the less stringent *Youngberg* standard applied, the Court would find that the four-month delay in reassigning Plaintiff to a bottom bunk was not "such a substantial departure from accepted professional judgment, practice, or standards" to render Defendant Winckler liable. *See Miguel*, 2024 WL 747232, at 5.

"Deliberate indifference is an extremely high standard to meet." *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).

A plaintiff must show both an objective and a subjective component to meet the deliberate-indifference standard. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). First, he must show that the deprivation was objectively serious—that it "violated contemporary standards of decency." *Hudson v. McMillian*, 503 U.S. 1, 8–9 (1991); *Walker v. Nunn*, 456 F. App'x 419, 422 (5th Cir. 2011). Then, to establish the subjective prong, the plaintiff must show that the official (1) was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and (2) actually drew the inference. *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999) (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 912 (5th Cir. 1998)). "[A] prison official cannot be found liable . . . unless the official knows of and disregards an excessive risk to inmate health or safety[.]" *Farmer*, 511 U.S. at 837 (1994). And the Fifth Circuit has "consistently recognized . . . that "deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Dyer v. Houston*, 964 F.3d 374, 381 (5th Cir. 2020) (quoting *Thompson v. Upshur Cnty*, TX, 245 F.3d 447, 458 (5th Cir. 2001).

Finally, a delay in medical care can only support a deliberate-indifference claim if the delay results in substantial harm. *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993); *Shapley v. Nevada Bd. of State Prison Com'rs*, 766 F.2d 404, 407 (5th Cir. 1995) (explaining that the delay of a plaintiff's surgery could not constitute deliberate indifference unless the denial was harmful).

It is undisputed that Plaintiff repeatedly sought and received medical attention for his knee between September 2021 and October 2022. The summary judgment records show

that Plaintiff consistently reported pain and discomfort, and at times he received over-the-counter pain medication and other treatments such as a knee brace and physical therapy. But throughout the medical records, examinations of his knee revealed no abnormality, no swelling, and no redness. Various medical providers noted that his gait was steady, he maintained full range of motion, he performed functions like sitting, standing, and walking without apparent difficulty.

The parties agree that Plaintiff fell on June 9, 2022, two days after he was assigned to a top bunk. The unrefuted medical records show that Plaintiff "walked into [the medical office] without signs of injury," that he had "no bruising or swelling," his gait was steady, and he was able "to sit and stand with ease out of a chair." Dkt. No. 73 at 18. He reported to Nurse Urbina that he could climb into the top bunk, but he requested something more stable to help him climb. *Id.* When Defendant Winckler spoke with Nurse Urbina after Plaintiff's June 9 fall, she told him that Plaintiff did not need a bottom bunk at that time. *Id.* at 98.

After receiving Plaintiff's MRI results a couple of weeks later, Nurse Urbina entered a new bottom-bunk pass, and it was communicated to Defendant Winckler. *Id.* at 16, 98. Winckler added Plaintiff to the bottom-bunk wait list, but at that time, there were already eight other residents waiting for a bottom bunk. In evaluating how to prioritize Plaintiff's need for a bottom bunk in the context of the full wait list, Winckler considered his personal observation of Plaintiff exercising and moving without trouble as well as discussing similar observations from other staff members. *Id.* at 98.

Between June and October, Plaintiff's knee condition seemed to improve. He completed physical therapy and turned in his knee brace. In August, Dr. Guy determined

that a bottom bunk was "not indicated." Around the same time, Plaintiff sent a communication form to Defendant Winckler asking about a bottom bunk, which Winckler reviewed. In September, a medical provider noted Plaintiff's improvement and canceled his referral to see an orthopedic specialist. Even so, a new bottom-bunk pass was entered. Defendant Winckler reassigned Plaintiff to a bottom bunk on October 3, 2022, when he was moved back to to Tier 4 housing.

Plaintiff's deliberate-indifference claim against Defendant Winckler fails for two reasons. First, nothing in the competent summary judgment evidence suggests that Defendant Winckler was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, or that he actually drew the inference. In short, Plaintiff's deliberate-indifference claim hinges on what Defendant Winckler knew and how he perceived it. The pleadings and undisputed records reveal that at all relevant times, Plaintiff walked normally, could sit and stand, and had no swelling or visible abnormalities on his knee. Medical providers gave inconsistent opinions on whether he needed a bottom bunk. Defendant Winckler personally observed him exercising without any apparent trouble. Based on his conversations with medical personnel and his personal observations of Plaintiff, Defendant Winckler did not give him high priority among the eight other residents on the wait list. Plaintiff has not pointed to any evidence that Defendant Winckler was aware of facts suggesting an excessive risk to Plaintiff's health, or that he actually inferred any substantial risk.

Second, the summary judgment evidence reflects that Plaintiff was not harmed by Defendant Winckler's four-month delay in reassigning him to a bottom bunk. Thus, even if Defendant Winckler was aware that his top-bunk assignment posed a threat to Plaintiff's

health or safety, his delay in providing a bottom bunk does not support a deliberate-indifference claim.

In sum, the Court concludes that there are no genuine issues of material fact remaining to require trial on Plaintiff's deliberate-indifference claim against Defendant Winckler. As a result, Defendant Winckler is entitled to summary judgment on this claim.

### D. Plaintiff's ADA claims also fail in light of the summary judgment evidence.

Finally, as thoroughly briefed by Defendants and in light of the summary judgment evidence, Plaintiff has not shown that Defendants violated his rights under the Constitution or the ADA.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A "public entity" includes "any department, agency, . . . or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(B).

To state a claim under the ADA, a plaintiff must show that (1) he has a qualifying disability, (2) he is being denied the benefits of services, programs, or activities or otherwise being discriminated against by a public entity, and (3) he is being discriminated against because of his disability. *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011).

#### i. Qualifying disability

Under the ADA, an individual has a disability if he has a physical or mental impairment that substantially limits one or more major life activities. 42 U.S.C. § 12102(1)(A); *see also* 29 U.S.C. § 705(9)(B). The determination of whether an impairment substantially limits a major life activity requires an individualized assessment. 29 C.F.R.

§ 1630.2. But Congress has made it clear that "that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations[] and . . . that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." *Neely v. PSEG Texas, Ltd. P'ship*, 735 F.3d 242, 245 (5th Cir. 2013). Courts are commanded to construe disability broadly, "to the maximum extent permitted by the terms of [the Act]." 42 U.S.C. § 12102(4)(A); *Williams v. Tarrant Cty. Coll. Dist.*, 717 Fed. App'x 440, 447 (5th Cir. 2018), *reh'g denied* (Feb. 20, 2018). This consideration may include factors such as the difficulty, effort, or time required to perform a major life activity; pain experienced when performing a major life activity; or the way an impairment affects the operation of a major bodily function. 29 C.F.R. § 1630.2.

**ii. Discrimination and Causation**

A plaintiff may satisfy the second and third prongs of the ADA analysis by establishing that a public entity failed to provide reasonable accommodations for his disability. *Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014). "A plaintiff proves a failure to accommodate by showing that the disability and its consequential limitations were known by the covered entity, and the entity failed to make reasonable accommodations." *Valentine v. Collier*, 993 F.3d 270, 290 (5th Cir. 2021). The plaintiff has the burden "to identify the disability, the limitation, and to request an accommodation in 'direct and specific' terms." *Id.* An accommodation is reasonable if it provides "meaningful access to the benefit." *Alexander v. Choate*, 469 U.S. 287, 301 (1985). A plaintiff is not entitled to an ideal accommodation; he is entitled only to an accommodation that is reasonable and effective. *See Wells v. Thaler*, 460 F. App'x 303, 313 (5th Cir. 2012); *E.E.O.C. v. Agro Distrib.,*

*LLC*, 555 F.3d 462, 471 (5th Cir. 2009). Courts also afford deference to an institutional facility's determination of an appropriate accommodation. *Arce v. Louisiana*, 226 F. Supp. 3d 643, 651 (E.D. La. 2016) (citing *Wells*, 460 F. App'x at 313).

Finally, "[a] plaintiff asserting a private cause of action for violations of the ADA or the RA may only recover compensatory damages upon a showing of intentional discrimination." *Delano–Pyle v. Victoria Cnty.*, 302 F.3d 567, 574 (5th Cir. 2002); *see also Windham v. Harris Cnty.*, Tex., 875 F.3d 229, 235 n.5 (5th Cir. 2017).

**iii. Discussion**

Plaintiff sues both TCCO and MTC officials for failing to accommodate his knee-related limitations with a bottom bunk assignment. But the summary judgment evidence shows that MTC is exclusively responsible for housing and bunk assignments at the TCCC, which Plaintiff does not refute. As discussed above, Plaintiff does not point to any record evidence to demonstrate that either Defendant Gonzales personally, or TCCO generally, participated in, reviewed, or influenced his bunk assignments. Thus, Defendant Gonzales is entitled to summary judgment on Plaintiff's ADA claim.

The MTC defendants argue that Plaintiff failed to establish that his knee troubles constitute a qualifying disability under the ADA. S*ee e.g., Riojas v. Unicco Serv. Co.*, 2005 WL 589419, at *3 (W.D. Tex. Mar. 14, 2005) (citing *Miller v. Airborne Exp.*, 1999 WL 47242 (N.D. Tex. Jan 22, 1999 )(explaining that, although "Miller's knee injury may substantially limit his ability to crawl, kneel, squat, or climb, . . . those actions do not constitute major life activities, as defined under the ADA"); *See also Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 758 n.2 (5th Cir. 1996) (finding as a matter of law that climbing does not qualify as a major life activity under the ADA)).

And in any event, the MTC defendants argue that Plaintiff's ADA claim must fail because it merely restates his deliberate-indifference claim. *See Estrada v. Dir., TDCJ-CID*, 2021 WL 9779049, at *19 (N.D. Tex. Feb. 25, 2021) (finding that "[a] claim is not proper under the ADA . . . if it is simply a restatement of a claim for the denial of medical care"); *see also Walls v. Tex. Dep't of Crim. Just.*, 270 F. App'x 358, 359 (5th Cir. 2008) (finding that the plaintiff's "claim is not properly brought under the ADA; it is simply a restatement of the denial-of-medical-care claim discussed above). Moreover, the Fifth Circuit requires "something more than 'deliberate indifference'" to show intentional discrimination for purposes of monetary damages under the ADA. *Miraglia v. Bd. of Supervisors of Louisiana State Museum*, 901 F.3d 565, 575 (5th Cir. 2018).

Even assuming Plaintiff can show that an accommodation was necessary, the MTC defendants assert that his requested accommodation was not reasonable. Specifically, they point to the record evidence that space at the TCCC was limited, and that there were more residents needing bottom bunks than there were available bottom bunks. They note that MTC staff created as many bottom bunks as possible, even cutting some bunk beds and placing former top bunks on the floor. Dkt. No. 73 at 96–97. But they were constrained by other security and safety considerations, like maintaining required clearances for fire safety, exit pathways, and wheelchair access. *Id.* at 5–6, 96–97. Thus, they contend that providing Plaintiff a bottom bunk in a preferred housing unit was unreasonable because it would have "impose[d] undue financial or administrative burdens." *Smith v. Harris Cnty., Tex.*, 956 F.3d 311, 317 (5th Cir. 2020).

They also point out that Plaintiff was offered a reasonable accommodation—a bottom bunk in a more secure housing area—but he refused it because he did not want to

lose recreational privileges or access to some of his personal belongings to comply with the security requirements in those areas. Dkt. No. 73 at 18. An accommodation is reasonable if it provides "meaningful access to the benefit." *Alexander v. Choate*, 469 U.S. 287, 301 (1985). Plaintiff is not entitled to his preferred accommodation, only one that is reasonable and effective. *See Wells*, 460 F. App'x at 313; *Agro Distrib., LLC*, 555 F.3d 462, 471 (5th Cir. 2009). Thus, the MTC defendants contend that Plaintiff was not entitled to his preferred accommodation, and his refusal to accept a reasonable alternative accommodation should result in the dismissal of his claim.

In light of the competent summary judgment evidence, Plaintiff cannot show that Defendants intentionally discriminated against him, so he is not entitled to relief on his ADA claim.[9] First, his ADA claim improperly repackages his medical-denial claim based on the same facts. But an intentional discrimination claim requires more than deliberate indifference, and for the same reasons discussed above, Plaintiff cannot satisfy that burden. Moreover, he has not shown that his knee pain substantially limits a major life activity. But even assuming that it constitutes a qualifying disability, and that Defendants were aware of the limitations imposed by his disability, he cannot show that Defendants failed to provide a reasonable accommodation. He asked for a bottom bunk, then refused to accept a bottom bunk because it was not in an ideal housing area. He has not shown that the accommodation he was offered—a bottom bunk in a higher security housing area—would not have been reasonable and effective. *See Wells*, 460 F. App'x at 313; *Agro Distribution, LLC*, 555 F.3d at 471. Plaintiff has failed to point to summary judgment evidence to show

[9]And to the extent Plaintiff seeks injunctive relief under the ADA, his claim is moot. The undisputed summary judgment evidence shows that Plaintiff was reassigned to a bottom bunk on October 3, 2022, and remains assigned to a bottom bunk still. Dkt. No. 73 at 85.

that Defendants intentionally discriminated against him or failed to reasonably accommodate a qualifying disability.

Simply put, no genuinely disputed material fact remains to require a trial on Plaintiff's ADA claims, and Defendants are entitled to summary judgment.

**5. Conclusion**

For these reasons, the Court grants Defendants' motions for summary judgment, Dkt. Nos. 71; 74, and dismisses with prejudice Plaintiff's complaint and all remaining claims within it.

All relief not expressly granted is denied, and any other pending motions are denied.

The Court will enter judgment accordingly.

Dated August 26, 2026.

JAMES WESLEY HENDRIX
United States District Judge